UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANGEL RIVERA, | : | |
| *Plaintiff*, | : | Civil Case Number |
| | : | |
| v. | : | 3:15-cv-01701 (VLB) |
| | : | |
| CAROLYN W. COLVIN | : | March 15, 2017 |
| COMMISSIONER SOCIAL SECURITY | : | |
| ADMINISTRATION | : | |
| *Defendant.* | : | |

## MEMORANDUM OF DECISION

Angel Rivera brings this 42 U.S.C. § 405(g) action to challenge the final decision of the Commissioner of Social Security ("Commissioner") denying Rivera's application for supplemental security income ("SSI") benefits. Rivera moves to reverse the Commissioner's decision, arguing as a general matter the Administrative Law Judge ("ALJ") erred by failing to provide substantial evidence of his decision and credibility determinations. The Commissioner moves to affirm, contending the ALJ properly evaluated Plaintiff's claim at Steps Two, Three Step Four, and Five. For the following reasons, the Court reverses and remands for proceedings consistent with the policy considerations of the Social Security Administration ("SSA") and this decision.

## Background

I. **Factual Background**

The Court accepts the facts from the parties' joint stipulation of undisputed facts and hereby incorporates them into this opinion. Dkt. 20 (Joint Stipulation of

1

Facts).  Briefly, Rivera was born on January 27, 1960.  Tr. 257.  He completed high school and worked as a loading dock helper, dishwasher, and prep cook.  Dkt. 20, at 16.  Rivera's last earnings date back to 2005, as Rivera was hit in the head by a forklift and ceased working after the accident.  *Id.* at 16-17.

Rivera experiences chronic pain in his hips, back, and shoulder.  In 2003, Rivera suffered a hip injury when a motor vehicle fell on his hip, which resulted in multiple visits to the emergency room.  He went to the emergency room after this incident.  *Id.* at 2.  He was diagnosed with a right hip contusion, *id.*, and went back to the emergency room in August 2009 complaining of the same pain for the same reason.  *Id.* at 2-3.[1]  Rivera last reported left hip pain in December 2010.  *Id.* at 6.  Since that date he has neither complained of nor received treatment for his hip condition.

From February 2009 through July 2013 Rivera was treated for chronic back pain.  In October 2009 an MRI revealed disc desiccation, disc bulging, and degenerative joint disease.  *Id.* at 4.  By March 2012 an evaluation by Dr. Thomas J. Stevens indicated no clinical evidence of acute issues with the back and Dr. Stevens classified his pain instead as "garden-variety sciatica."  *Id.* at 10.  Since then he has neither complained of nor received treatment for his degenerative joint disease.

---

[1] The medical notes state the "pain began 6 months ago when a car fell on him." Tr. 409.  Other evidence supports a finding that he sustained the injury in 2005, and it may have occurred to his left hip.  Tr. 452 (wherein Rivera reported in 2010 that a truck fell on his left hip five years ago).

Rivera also received treatment for right shoulder pain in 2010 due to a fall in the shower that occurred November 2009.  *Id.* At 4.  Aside from this incident, he has neither complained of nor received treatment of his degenerative joint disease.

Finally, Rivera has also been treated for insomnia, hypertension and diabetes mellitus; *id.* at 2, 7; 3, 5, 15; and 7, 15, respectively; however, the record does not contain any information concerning the debilitating effects of these conditions.

Rivera has a history of mental health and substance abuse issues.  *See id.* at 2-3.  In February 2012, Rivera received a psychiatric evaluation by Dr. Jay M. Cudrin.  *Id.* at 8.  Dr. Cudrin evaluated Rivera and determined Rivera to have a Full Scale IQ of 66, Verbal IQ of 67, and Performance IQ of 70.  *Id.*  He scored Rivera's word recognition at a standard of 62 (third grade level).  *Id.*  In 2014, Rivera reported symptoms of depression.  *Id.* at 15-16.  Rivera reported symptoms of episodic depression following the murders of his brother and nephew.  *Id.* at 9. Finally, Rivera is addicted to alcohol and methamphetamine. *See id.* at 2-3.

Rivera has been evaluated on multiple occasions by each of the following doctors: Dr. B. Gould (Primary Care), Dr. Stanley Glassman (Primary Care), Dr. Gary Italia (Chiropractor), and Dr. Stevens (Orthopedics).  Dr. Cudrin (Psychologist) met with Rivera on one occasion and performed a psychological testing evaluation.  *Id.* at 8-9.  Several State agency consultants, Dr. Adrian Brown (Psychology), Dr. Lois Wurzel (Medical), Dr. Kenneth Bangs (Psychology), Dr. Abraham Bernstein (Medical), also evaluated his case.  These evaluations in conjunction with objective medical evidence form the primary basis for the ALJ's decision.

II. **Brief Procedural Overview**

The following facts are also taken from the parties' joint stipulation of undisputed facts. Dkt. 20. Rivera filed an application for supplemental security income (SSI) payments on July 17, 2012, alleging an onset date of July 30, 2008. *See id.* at 1; Tr. 257 (onset date of July 30, 2008). Rivera's application and reconsideration were both denied. Dkt. 20 at 1. Plaintiff then requested a hearing before an ALJ and subsequently amended the onset date to July 17, 2012. *Id.* The hearing before the ALJ took place on July 23, 2014, and on August 20, 2014, the ALJ issued a decision finding Rivera was not disabled. *Id.* Rivera sought review by the Appeals Council, but review was denied. *Id.* at 1-2. This appeal followed.

III. **The ALJ's Decision**

The ALJ issued the following findings. Rivera did not engage in substantial gainful activity since January 17, 2012. Tr. 14. Rivera suffered from the following severe impairments: lumbar spondylosis, stenosis, and borderline intellectual functioning. *Id.* Rivera suffered from the following nonsevere impairments: hypertension, hyperlipidemia, diabetes mellitus, diabetic ketoacidosis, memory loss from head injury, post-concussion syndrome. *Id.* at 15-16. Rivera's hypertension and hyperlipidemia appear to be under good control with medication. *Id.* at 15. Although Rivera has been admitted to the emergency room for uncontrolled diabetes mellitus and diabetic ketoacidosis, the hospital records indicated Rivera admitted to decreased use of his diabetic medications and a later

follow-up appointment with his primary care physician determined his diabetes to be under control with prescribed insulin. *Id.* Medical evidence of his alleged memory loss from head injury shows essentially normal findings and lacking traumatic brain injury or memory loss as alleged. *Id.* at 16.

In addition, Rivera's severe impairments, either individually or collectively, do not meet or equal the severity of one listed impairment under 20 C.F.R. Part 404. Specifically, there is no evidence that Rivera's hip impairments result in the inability to effectively ambulate, a major dysfunction of a joint, or motor loss under Sections 1.00B2b, 1.02, and 1.04. *Id.* Rivera's mental impairments do not meet or medically equal the criteria under Listings 12.02B and 12.05D. *Id.*

In light of Rivera's symptoms, the ALJ found that Rivera has the residual functioning capacity to perform medium work and carry out and remember simple instructions. *Id.* at 18. While noting that the medically determinable impairments to which Rivera testified could reasonably be expected to cause the alleged symptoms, the ALJ found that his professed "persistence and limiting effects of these symptoms are not entirely credible. . . ." *Id.* at 20. Evidence supports a finding that Rivera's medications are "relatively effective in controlling [his] symptoms." *Id.*

Of note, the ALJ concluded that there are inconsistencies in Rivera's testimony; for example, Rivera testified he lost his dog yet also testified he had to give the dog away due to his inability to care for her. *Id.* at 22. It is unclear to the court that those two statements are inconsistent. The word "lost" has three meanings, one of which denotes something "that has been taken away or cannot

be recovered." *Lost*, Oxford Living Dictionaries (2017 Oxford Univ. Press), https://en.oxforddictionaries.com/definition/lost (last visited March 15, 2017). We use the word "lost" to mean involuntary disposition of dispossession. For example, when we are terminated we say we lost our job. When a parent dies we say we lost our parent. Thus, it may not be inconsistent for Rivera to have said he lost his dog if he had to give away his dog because he was no longer able to care for him. Rivera's testimony would need to be developed further in order to ascertain whether there is an inconsistency.

Furthermore, Dr. Glassman's conclusions that Rivera is unable to work for medical reasons and related observations do not comport with the objective evidence. *Id.* at 23. The ALJ found that Dr. Glassman gave conflicting opinions, noting that the doctor's opinion that Rivera could use his feet to repetitively push and pull leg controls is irreconcilable with his opinion that Riviera could not stand more than two hours and walk for two hours. *Id.* at 23-24. It is unclear to the Court that these statements are inconsistent as the exertion required to perform these activities is not the same. Operating push and pull leg controls is not a full weight bearing activity and the opinion does not state how long Rivera could operate such controls. These statements, rather than being inconsistent, are ambiguous and therefore the record would have to be developed further in order to understand their relative meaning.

Finally, Rivera is considered to have no relevant work as the record is unclear as to whether work activity he performed in the past fifteen years meets the definition of past relevant work under 20 C.F.R. § 416.965. *Id.* at 24. Rivera is

defined as an individual "closely approaching advanced age" pursuant to 20 C.F.R. § 416.963. *Id.* at 25. He has at least a high school education and can communicate in English. *Id.* The vocational expert testified there are jobs that exist in significant numbers in the economy that Rivera can perform, such as kitchen helper and food service worker, hospital positions. *Id.*

## Discussion

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citations omitted). "[A district court] must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F.Supp.2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

To be "disabled" under the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The SSA has promulgated the following five-step procedure to evaluate disability claims:

1. First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity ("Step One").

2. If she is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits her physical or mental ability to do basic work activities ("Step Two").

3. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations ("Step Three").

4. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the Residual Functional Capacity ("RFC") to perform her past work ("Step Four").

5. Finally, if the claimant is unable to perform her past work, the [Commissioner] then determines whether there is other work which the claimant could perform ("Step Five").

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citing 20 C.F.R. § 404.1520).

The parties do not dispute the Step One finding that Rivera did not engage in substantial gainful activity since January 17, 2012. But Rivera challenges every other Step in the ALJ's analysis. Rivera challenges the ALJ's Step Two finding that his diabetes and hip impairments did not constitute severe impairments. Dkt. 21-1 (Pl.'s Mot. to Reverse) at 14-15. Rivera also contests Step Three, particularly with respect to the fact the ALJ discredited Dr. Cudrin's IQ testing scores. Rivera challenges the Step 4 finding that she had the residual functional capacity to perform medium work insofar as the ALJ partially discredited Rivera's complaints

8

of pain and Dr. Glassman's medical opinion.  Finally, Rivera takes issue with the vocational expert's testimony and argues the faulty hypotheticals caused the expert to not consider the combination of Rivera's impairments.  Rather than address each challenge in chronological order, the Court addresses Step Three as the issue is dispositive for this appeal.

I. <u>Step Three</u>

Step Three requires the ALJ to compare the claimant's severe impairments with a listed impairment under 20 C.F.R. Part 404, Subpt. P, App. 1.  The ALJ compared Rivera's hip impairment to Listing 1.00B2b and 1.02 under Section 1.00 ("Mulsculoskeletal System") and mental impairment to Listing 12.02 and 12.05 under Section 12.00 ("Mental Disorders").  Importantly, with respect to Section 12.00, the Social Security Administration solicited comments and revised the listing referred to by the ALJ, effective January 17, 2017.  *See* Revised Medical Criteria for Evaluating Mental Disorders ("Revised Medical Criteria"), 81 Fed. Reg. 66,137 (Sept. 26, 2016) (to be codified at 20 C.F.R. Part 404, Subpt. P, App. 1).  Both Listings 12.02 and 12.05 have substantively changed as a result.  The Court must first address which listing version should be analyzed at this stage.

In general, "[r]etroactivity is not favored in the law" and "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires the result."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  An agency does not have the authority to create retroactive rules unless it has express authority by Congress to do so.  *See id.*  Under the

Social Security Act, Congress gave the Commissioner of the SSA the "full power and authority to make rules and regulations and to establish procedures . . . which are necessary to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder."  42 U.S.C. § 405(a).  This provision does not grant the SSA express statutory authority to retroactively promulgate rules.  *See Nutkins v. Shalala*, No. 92-CV-40, 1994 WL 714252, at *3 (W.D.N.Y. Dec. 22, 1994); *Cherry v. Barnhart*, 327 F. Supp. 2d 1347, 1357 (N.D. Okla. 2004).  Likewise, this Revised Medical Criteria does not purport to retroactively apply the new listing for any case where a final agency decision has been made.[2]  Therefore, the Court will evaluate the ALJ's determination under Step Three pursuant to the listings that were in effect at that time.

At Step Three, the ALJ considered whether Rivera had a mental impairment and assessed whether any such impairment met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpt. P, App. 1.  The ALJ addressed both Listing 12.02 ("Organic Mental Disorders") and Listing 12.05 ("Intellectual Disability").  The Court does not take issue with the ALJ's analysis of Listing 12.02 as the ALJ provided substantial evidence in support of his determination.

---

[2] The Revised Medical Criteria states, "The prior rules will continue to apply until the effective date of these final rules.  When the final rules become effective, we will apply them to new applications filed on or after the effective date of the rules, and the claims that are pending on or after the effective date."  Revised Medical Criteria, 81 Fed. Reg. at 66138.

However, with respect to the ALJ's analysis of Listing 12.05, the Court finds the ALJ erred when he discredited Dr. Cudrin's IQ test.

Listings 12.05C and 12.05D both require the claimant to have "a *valid* verbal, performance, or full scale IQ of 60 through 70. . . ." 20 C.F.R. Part 404, Subpt. P, App. 1, §§ 12.05C, 12.05D (emphasis added). On February 24, 2012, Dr. Cudrin performed psychological testing, which placed Rivera's verbal performance and full scale IQ between 60 and 70.[3] He found Rivera had a full scale IQ of 66, a verbal IQ of 67, and a performance IQ of 70. Tr. 480. Dr. Cudrin found that Rivera "was rational and his answers were relevant, but he was confused about background events," noting that "[s]ome of his answers contradicted other things he said and he had trouble remembering exactly when important personal events took place." Tr. 478. Importantly, Dr. Cudrin stated, "He displayed no intention of exaggerating psychiatric problems, drew nine times on Rey's Revised Memory Test, and showed no intention of exaggerating cognitive problems." *Id.* These findings explain how Rivera could give inconsistent testimony that does not undermine his credibility, but instead supports his disability claim. The Court concludes therefore that the ALJ disregarded Dr. Cudrin test results in their entirety.

This conclusion is further supported by the fact that, notwithstanding Dr. Cudrin's findings, the ALJ found Dr. Cudrin's psychological testing to be invalid. *Id.* at 18. The ALJ cited instances where Rivera responded inconsistently or

---

[3] Specifically, Dr. Cudrin performed the following tests: Bender Visual Motor Gestalt Test, Cognistat, Rey's Revised Memory Test, Rorschach Inkblot Test, Test of Nonverbal Intelligence – Third Edition (TONI-III), Wechsler Adult Intelligence Scale – Third Edition (WAIS-III), Wide Range Achievement Test – Third Edition (WRAT3 Word Recognition Section). Tr. 478.

"erratically" to testing; for example, the ALJ reflected upon the "mixed results on the Cognistat test" and the claimant's difficulty with TONI-III and Matrix Reasoning. *Id.* It appears that Rivera's difficulty with testing, Rivera's denial of "most symptoms associated with psychiatric conditions and depression," and Dr. Cudrin's opinion that Rivera could perform entry-level positions and handle work relationships, led the ALJ to discredit Dr. Cudrin's IQ testing results. In support, the ALJ also cited a previous ALJ decision discussing a March 2009 evaluation suggestive of malingering.[4]  *Id.*

Dr. Cudrin's IQ testing results put Rivera within the IQ range of the 12.05C and 12.05D listings, which should have prompted the ALJ to continue evaluating the additional requirements under the sections. "Psychological testing" is considered "laboratory findings," because the tests "are anatomical, physiological, or psychological phenomena which can be shown by the use of a medically acceptable laboratory diagnostic techniques."  20 C.F.R. § 416.928(c). "By their very nature, IQ results are not statements from doctors, reflecting their judgment; instead IQ scores result from a claimant's performance on a standardized test."  *Miller v. Astrue*, No. 3:07-CV-1093 (LEK/VEB), 2009 WL 2568571, at *6 (N.D.N.Y. Aug. 19, 2009) (citing *Merriam-Webster Online Dictionary*, IQ Definition, http://www.merriam-webster.com/dictionary/IQ (last visited June 5, 2009) (defining IQ as "a number used to express the apparent relative intelligence

---

[4] This ALJ decision refers to a time period predating the instant action. As such, the previous ALJ reviewed evidence not before the Court today and the Court does not find that reliance upon the previous decision to be a valid reason for discrediting the IQ test scores.

12

of a person . . . a score determined by one's performance on a standardized intelligence test relative to the average performance of others of the same age")).

The way in which the ALJ determined Dr. Cudrin's IQ testing to be "invalid" suggests the ALJ treated Dr. Cudrin's evaluations as a medical opinion. "Medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). An ALJ may not discredit or assign weight to IQ testing as if it is a medical opinion because IQ testing is more adequately considered a "laboratory finding." See *Miller v. Astrue*, 2009 WL 2568571, at *6; *Hochstine v. Colvin*, No. 1:14-cv-00916(MAT), slip op. at 3 (W.D.N.Y. June 14, 2016). Notably, the ALJ points to no evidence in the record indicating a state agency psychological consultant found Dr. Cudrin's testing invalid or that other IQ test results conflicted with Dr. Cudrin's analysis. In instances where an ALJ finds an evaluation to be self-contradictory, the preferred approach is for the ALJ to "contact [the doctor] for clarification and . . . obtain additional testing and evaluation, if necessary, from another practitioner," not to deny the claim.[5] *Hochstine v. Colvin*, slip op. at 3. The

---

[5] To the extent that the Second Circuit has upheld on one occasion in a summary order an ALJ's finding that a doctor's consultative psychological examination resulting in an IQ score of 57 to be invalid, the Court notes the distinction that the ALJ compared the doctor's evaluation to "the record as a *whole*." *Burnette v. Colvin*, 564 F. App'x 605, 608 (2d Cir. 2014) (emphasis added). Here, the ALJ only addressed inconsistencies *within* Dr. Cudrin's testing results and in support cited a previous ALJ determination of the claimant's malingering derived from evidence outside the scope of this case. The Court finds the facts of *Burnette*

13

**ALJ did neither. Therefore, the ALJ erred in determining Dr. Cudrin's IQ test results to be invalid.**

**In support of the Court's conclusion are the SSA's responses to comments regarding the rulemaking process for the now effective Revised Medical Criteria. Comments included concern for the proposed rule language, "valid test score," as "the language . . . would give an inappropriate amount of discretion to the adjudicators who do not have the expertise of the test administrators." Revised Medical Criteria, 81 Fed. Reg. at 66148.[6] The commenters explicitly referenced an example where an ALJ rejects a "valid test score" when a claimant's "strengths in one area are used to find that the person's test results or limitations in another area are 'not credible.'" *Id.* In response, the SSA eliminated the word, "valid," from the listing that references IQ scores. *See* 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05B. The SSA also "revised the guidance to indicate that only qualified specialists, Federal and State agency medical and psychological consultants, and other contracted medical and psychological experts, may conclude that an obtained IQ score(s) is not an accurate reflection of a claimant's general intellectual functioning." *Id.* Based upon the SSA's response, the Court suspects this case is an example of the concern expressed by the commenters and the reason why the SSA changed the listing reviewed by the ALJ. Although the Court acknowledges this revision was not in place at the time the ALJ made its determination and is**

---

**distinguishable and additionally notes that summary orders do not have precedential effect, particularly in light of the recent policy changes.**
[6] **The term "valid" appears the Listing 12.05C and 12.05D to which the ALJ referred in August 2014.**

therefore not controlling authority, such a revision as a matter of policy clearly supports the Court's conclusion that the ALJ erred by discrediting an IQ test that no other medical professional appears to have questioned.

Relying upon his erroneous finding that Dr. Cudrin's IQ scores were invalid, the ALJ failed to analyze Listing 12.05C.[7]  Listing 12.05C states the level of severity is met when "[a] valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function."  As an ALJ is required to provide substantial evidence in support of his findings, his failure to address the second element of Listing 12.05C warrants reversal and remand for further administrative proceedings.

The SSA provides, "If a court reverses our final decision and remands a case for further administrative proceedings after the effective date of these final rules, we will apply these final rules to the entire period at issue in the decision we make after the court's remand."  Revised Medical Criteria, 81 Fed. Reg. at 66138 n.1.  The Court does not view this guidance to raise a retroactivity issue as future proceedings will necessarily create a new record.  *See, generally, Retroactive*, Black's Law Dictionary (10th ed. 2014) (defining "retroactive" as "extending in scope or effect to matters that have occurred *in the past*") (emphasis added).

---

[7] Listing 12.05D contains identical language to Listing 12.02B, which the ALJ addressed in depth.  The Court finds the ALJ would have provided substantial evidence to support his conclusion with respect to Listing 12.02B were he to have concluded the IQ scored to be valid.

**Accordingly, the Court anticipates that the ALJ will utilize the new Listing 12.00, effective January 17, 2017, when conducting further proceedings.**

**The ALJ has expressed his discontent with Dr. Cudrin's IQ testing. Should his discontent persist, he should seek evaluations from state agency medical and psychological consultants or order additional IQ testing from a different practitioner.**

## II.   Plaintiff's Additional Challenges

**The Court need not determine Rivera's additional challenges in light of the Court's decision to remand for proceedings consistent with SSA policy and this decision. To the extent the ALJ deems appropriate, this remand serves as an opportunity for the ALJ to reconsider or further expand upon its ruling with respect to Rivera's challenges as to Step Two, Step Four, and Step Five. The ALJ is instructed to consider that a combination of all of Rivera's impairments may be sufficient to warrant a finding the claimant is disabled.**

## Conclusion

**For the reasons set forth herein, the Court GRANTS the Plaintiff's Motion to Reverse the Decision of the Commissioner and DENIES the Defendant's Motion to Affirm the Decision of the Commissioner. The Court finds the ALJ erred in discrediting Dr. Cudrin's IQ test results as IQ tests are "laboratory findings," not "medical opinions." There Court hereby REMANDS the case for further proceedings consistent with this decision.**

**IT IS SO ORDERED.**


_____**/s/**_____
**Hon. Vanessa L. Bryant**
**United States District Judge**


**Dated at Hartford, Connecticut:  March 15, 2017**